Entered on Docket
June 30, 2006
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED

JUN 29 2006

CLERK
UNITED STATES BANKRUPTCY COURT
SAN JOSE, CALIFORNIA

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                             Case No. 02-55795 JRG

3DFX INTERACTIVE, INC.,

                    Debtor.                 Chapter 11

_____/

**MEMORANDUM DECISION**

**I.     INTRODUCTION**

        The court has before it a Liquidating Plan of Reorganization, and accompanying Disclosure Statement, filed by the Official Committee of Unsecured Creditors. The Disclosure Statement, and underlying Plan, have drawn numerous objections. For the reasons hereafter stated, the Disclosure Statement cannot be approved in its present form.

        Also before the court is a Motion to Compel Discovery Responses from the Creditors' Committee and its Counsel filed by the Official Committee of Equity Security Holders. The discovery requests seek information regarding possible conflicts counsel for the Creditors' Committee may have regarding the settlement of certain litigation that forms the basis for the Plan and Disclosure Statement. For the reasons hereafter stated, the motion to compel is denied without prejudice on procedural grounds.

**II.    BACKGROUND**

        Debtor 3dfx and nVidia Corporation were competitors in the field of 3D graphics processor chips for video games and personal computers. In 1998 3dfx filed a patent infringement lawsuit against nVidia. Approximately two years later, in October 2000, 3dfx received what it believed was a favorable

MEMORANDUM DECISION                                                                                    1

ruling in the case when the court adopted 3dfx's claimed construction of the patent and rejected nVidia's construction. Within weeks, nVidia initiated negotiations to purchase 3dfx's graphics chip business. 3dfx was apparently having financial difficulties at that time. In connection with the negotiations, the parties appear to have agreed that 3dfx would run out of cash in early 2001.

nVidia's opening offer to 3dfx was $100 million in cash. 3dfx countered with $100 million in cash and one million shares of nVidia stock. The parties ultimately agreed upon a cash portion of $70 million for the business. Fifteen million dollars was paid at the time the deal was signed and was used as a bridge loan allowing 3dfx to continue operating through the closing of the sale. The remaining $55 million was paid at the time the deal closed. The agreement also included one million shares of nVidia stock. However, under the terms of the signed asset purchase agreement dated December 15, 2000, the transfer of the one million shares of nVidia stock was conditioned upon 3dfx dissolving in a manner approved by nVidia and certifying that all liabilities had been paid in full or in a manner satisfactory to nVidia. The latter was not accomplished as 3dfx was unable to pay its creditors and the nVidia stock was never transferred to 3dfx.

Prior to the filing of the bankruptcy petition, two of 3dfx's landlords filed suit over the nVidia transaction. Carlyle Fortran Trust filed an action against nVidia and certain of its executives, and 3dfx and certain of its directors, officers and/or shareholders. The action sought remedies for intentional interference with contract, fraudulent transfer, unfair business practices and declaratory relief.

The second landlord, CarrAmerica Realty Corporation, filed its own action against nVidia and certain directors, officers and/or shareholders of 3dfx. This action also sought remedies for intentional interference with contract, fraudulent transfer, unfair business practices and declaratory relief, as well as conspiracy, successor liability and tortious and negligent interference with prospective business advantage. These two suits have generally been referred to as the Landlord Actions.

When 3dfx was unable to resolve its problems through negotiations and actions taken in the state court, it filed its chapter 11 bankruptcy petition on October 15, 2002. Shortly thereafter, on January 3, 2003, nVidia removed the Landlord Actions to the bankruptcy court. Three months after the bankruptcy filing, on January 24, 2003, William Brandt, Jr. was appointed the chapter 11 trustee. On February 24, 2003, Brandt filed suit against nVidia to recover a fraudulent transfer and to establish successor liability

**MEMORANDUM DECISION**  2

in connection with the nVidia sale.

There were now three actions pending before the bankruptcy court involving 3dfx, nVidia and a variety of related parties. As the actions involved a common set of facts, the court consolidated the three actions for purposes of discovery in or about June 2003. Discovery proceeded, although progress was slow and the court's assistance was required on several occasions. Almost a year and a half later, in late 2004, nVidia and the Trustee indicated that the parties to the litigation had agreed to participate in a mediation of the pending claims. The first mediation session was held in February 2005.[1]

It is clear that there was no settlement between nVidia and the Trustee or between nVidia and Carlyle or CarrAmerica. Although it is not clear to the court exactly what transpired, it appears that there may have been no further mediation sessions between nVidia and the Trustee, Carlyle and CarrAmerica. However, the Creditors' Committee, while not a party to the litigation, indicates that it conducted direct negotiations with nVidia over the next eight months.[2] In late October 2005, the Creditors' Committee apparently reached a settlement with nVidia which is set forth in a settlement agreement having an effective date of November 1, 2005.[3]

As the Creditors' Committee was not a party to the litigation, and as the causes of action belonged to the bankruptcy estate, the Committee had no standing to propose a compromise of controversy under Rule 9019 of the Federal Rules of Bankruptcy Procedure. The only available alternative was for the Creditors' Committee to propose a plan of reorganization. As such, it filed its Liquidating Plan of Reorganization, and accompanying Disclosure Statement, on January 13, 2006. The plan proposed a settlement of the nVidia litigation for a cash contribution of $30,524,759.77.[4]

**III. OBJECTIONS TO THE CREDITORS' COMMITTEE'S DISCLOSURE STATEMENT**

The Creditor's Committee's Plan immediately drew a myriad of objections. Objections were filed by the Chapter 11 Trustee, the Official Committee of Equity Security Holders and Carlyle Fortran

---

[1] Creditors' Committee's First Amended Disclosure Statement at page 30.

[2] Creditors' Committee's First Amended Disclosure Statement at page 30.

[3] Creditors' Committee's First Amended Disclosure Statement at page 31.

[4] Creditors' Committee's First Amended Disclosure Statement at page 31.

MEMORANDUM DECISION 3

Trust. Concerns were also expressed by the United States Trustee and the United States Securities and Exchange Commission. The concerns of the Commission are set forth in a letter dated March 24, 2006, a copy of which is attached.

Although there are a great many issues regarding the sufficiency of the disclosure statement, the threshold issues challenge the integrity of the process by which the Creditors' Committee reached a settlement with nVidia.[5] Questions are raised about whether counsel for the Creditors' Committee has conflicts of interest that taint the process. Similarly, questions are raised about five of the seven members of the Creditors' Committee and whether they also have conflicts that could possibly taint the process.

### A.  Counsel For The Creditors' Committee.

The Trustee asserts:

> The principal authors of the Disclosure Statement and Liquidating Plan, Sedgwick, Detert, Moran and Arnold LLP ("Sedgwick"), *disqualified themselves* as Committee counsel for purposes of negotiating the nVidia settlement because Sedgwick represented at least one of nVidia's insurance carriers against whom nVidia had apparently made a coverage demand. That conflict and subsequent voluntary disqualification denied the Committee the advice of its experienced counsel most familiar with the nVidia Litigation. Now, without any explanation as to how that conflict was resolved, that very same counsel is sponsoring a Liquidating Plan which, if confirmed and made effective, would appear to reduce or eliminate entirely the exposure, if any, faced by that firm's insurance carrier client.

Objection to First Amended Disclosure Statement filed February 28, 2006, 3:9-18 (emphasis in original). The Equity Security Holders' Committee vigorously joins in raising these concerns and it appears to the court that the United States Trustee as well as other parties are closely watching developments.

When Sedgwick disqualified itself as Creditors' Committee counsel, the firm of Adorno & Yoss, P.A. was appointed to assist the Creditors' Committee in the mediation. In his objection, the Trustee points out:

> The Committee's other counsel, Adorno & Yoss, P.A., which served as counsel to Committee member Avnet Electronics until Sedgwick disqualified itself, carries its own conflicts baggage. As set forth above, Avnet Electronics asserts a claim against this estate by virtue of a claim against STB. Avnet has been sued by the Trustee to recover an alleged fraudulent conveyance in the amount of $902,610.74. Confirmation of the

---

[5] Since the threshold issues involve the integrity of the bankruptcy system, the court will not address the remaining problems until these issues are resolved.

Committee's Liquidating Plan would result in the removal of the Trustee, to be replaced by a Liquidating Trustee of a Liquidating Trust appointed by and under the guidance of the Committee. Specifically, as to the STB Avoidance Actions (as defined in the Liquidating Plan) a three member Liquidation Subcommittee, selected by the Committee but consisting of members who are not STB creditors, shall "fulfill the Committee's role." (Disclosure Statement 43:11-16). Thus, the Liquidating Plan allows Avnet Electronics and other STB creditors on the Committee to select the Liquidating Trustee *and* the Liquidation Subcommittee responsible for continuing, dismissing or settling the STB Avoidance Actions.

Objection to First Amended Disclosure Statement filed February 28, 2006, 3:19 - 4:3 (emphasis in original). Obvious conflicts questions exist regarding both Adorno & Yoss and Avnet Electronics.

Anyone familiar with this bankruptcy case can not help asking an obvious and telling question: how and on what basis did the Creditors' Committee settle with nVidia?

In its Disclosure Statement the Creditors' Committee states that the bankruptcy court felt it best to include the Creditors' Committee in the mediation process.[6] This is simply an incorrect statement. To the best of this court's knowledge, counsel for the Creditors' Committee had relatively little involvement in the litigation since the appointment of the Trustee in January 2003. As such, the court had given no thought to participation by the Creditors' Committee in the mediation.

Subsequent disclosures appear to confirm the court's observations. In a letter dated April 18, 2006, Sedgwick pointed out that: "The Committee has never been a party to either the Landlord Actions or the nVidia Action filed by the Trustee, nor has it participated in any discovery or hearings in those actions."[7] Moreover, the Creditors' Committee did not even intend to participate in the mediation until invited to do so by the mediator.[8] It would seem that Sedgwick had relatively little information about the details of the litigation and the Adorno law firm would likely have had less information.

If these observations have any substance, how can the Creditors' Committee have enough information to settle a lawsuit in which millions of dollars have been spent on discovery? Moreover, how can the Creditors' Committee demonstrate factually that the settlement is fair and equitable, the legal standard that applies in bankruptcy? See In re Arden, 176 F.3d 1226, 1228 (9th Cir. 1999). These

---

[6] Creditors' Committee's First Amended Disclosure Statement at page 30.

[7] Letter from Steven D. Roland to Robert E. Izmirian dated April 18, 2006, page 2.

[8] Letter from Steven D. Roland to Robert E. Izmirian dated April 18, 2006, page 2.

MEMORANDUM DECISION 5

are questions that must be addressed if the integrity of the system is to be maintained.

### B. Members Of The Creditors' Committee.

The Trustee points out that three of the seven members of the Creditors' Committee are defendants in lawsuits commenced by the Trustee. The claims total $3,919,300.35. Two other members have significant business relationships with nVidia. On the latter point, there apparently was recognition of the conflict problem as the Disclosure Statement states that two of the Committee members did not participate in the mediation.[9] Thus, it appears that five of the seven members of the Creditors' Committee have likely conflicts of interest.

It has also been alleged that the Creditors' Committee vote to accept the settlement with nVidia was not unanimous. In the context of the alleged conflicts, it may well be necessary to know who voted to support the settlement and why, and who voted against it and why. As with the questions surrounding counsel, these are questions that must be addressed if the integrity of the system is to be maintained.

Finally, the Securities and Exchange Commission raised the issue of good faith in connection with the Creditors' Committee Plan. Of course, a finding of good faith is a requirement for confirmation under Bankruptcy Code § 1129(a)(3). Without a resolution of all the conflict issues, no determination of good faith is possible and the Creditors' Committee's Plan is unconfirmable as a matter of law.[10]

## IV. DISCUSSION

### A. Adverse Interest under Bankruptcy Code § 1103(b)

Sedgwick opposes responding to interrogatories propounded on it by the Equity Security Holders' Committee on the basis that Sedgwick is not a party and cannot be compelled to answer interrogatories under Bankruptcy Rule 7033. This court has not previously applied Part VII of the Federal Rules of Bankruptcy Procedure to the objections to the Creditors' Committee's Disclosure Statement. However, those rules are routinely applied by this court in contested matters, objections to claims, objections to confirmation of chapter 13 plan, and other disputed matters that require discovery and an evidentiary hearing. Sedgwick has been employed by this court pursuant to Bankruptcy Code

---

[9] Creditors' Committee's First Amended Disclosure Statement at page 30.

[10] The court notes that the Creditors' Committee filed a Second Amended Disclosure Statement at the time of the last hearing. Based on a review of that Disclosure Statement, the conflict questions remain unresolved.

MEMORANDUM DECISION 6

§ 1103 and Bankruptcy Rule 2014. A dispute involving possible conflicts related to that employment is an appropriate instance for this court to apply Part VII of the Bankruptcy Rules.

"A creditors' committee stands as a fiduciary to the class of creditors it represents. Its principal function 'is to advise the creditors of their rights and the proper course of action in the bankruptcy proceedings.'" In re Caldor, Inc.-NY, 193 B.R. 165, 169 (Bankr. S.D.N.Y. 1996) (citations omitted). The Bankruptcy Code grants committees the power to employ professionals. 11 U.S.C. § 1103(a). A professional employed to represent a committee "may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case." 11 U.S.C. § 1103(b). "Adverse interest" is not defined in the Bankruptcy Code and whether one exists is determined on a case-by-case basis. Caldor, 193 B.R. at 171. The oft-cited definition of an adverse interest is:

> (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

In re Roberts, 46 B.R. 815, 827 (Bankr. D. Utah 1985), *rev'd in part on other grounds*, 75 B.R. 402 (D. Utah 1987).

In reviewing whether counsel for a creditors' committee holds an adverse interest, this court must independently review the facts of the case while recognizing that a party's choice of counsel is entitled to a certain amount of deference. In re National Century Financial Enterprises, Inc., 298 B.R. 112, 117 (Bankr. S.D. Ohio 2003). "The court, in cases of alleged conflict of interest, must apply the particular facts of the case to the intended meaning of Bankruptcy Code Section 1103(b)." In re Oliver's Stores, Inc., 79 B.R. 588, 595 (Bankr. D.N.J. 1987) (citation omitted). "While the 1984 Amendments have caused a shift away from the per se prohibition of dual representation, Section 1103(b) still operates as a watchdog to prevent impropriety." Oliver's Stores, 79 B.R. at 596. The Oliver's Stores court particularly noted that "the integrity of the bankruptcy system demands that the professionals serving the committee not place themselves in a situation where their independence, loyalty and integrity can be questioned by the unsecured creditor body whom they represent." Oliver's Stores, 79 B.R. at 597.

In order for this court to exercise its independent obligation to monitor potential adverse interests of professionals employed by the court, this court must be able to obtain information from those

professionals. The integrity of the bankruptcy system demands it. This court finds that applying Part VII of the Bankruptcy Rules to the objections to the Creditors' Committee's Disclosure Statement and Plan arising from Sedgwick's potential conflict of interest in proposing that Plan is an appropriate means for resolving the issues before this court. Since the court had not expressly applied those rules at the time the Equity Security Holders' Committee served the discovery on Sedgwick that it now moves to compel, the motion to compel is denied without prejudice on procedural grounds.

### B. Issues Regarding Plan Confirmation

There are certain other threshold matters that concern this court. Confirmation of a chapter 11 plan requires the court to find that the plan has been proposed in good faith. 11 U.S.C. § 1129(a)(3). Based on the information currently before this court, there appears to be a serious question regarding whether this court could make that good faith finding. With respect to plan confirmation,

> [g]ood faith is assessed by the bankruptcy judge and viewed under the totality of the circumstances. Good faith requires a fundamental fairness in dealing with one's creditors. The bankruptcy judge is in the best position to assess the good faith of the parties. Good faith requires that a plan will achieve a result consistent with the objectives and purposes of the Code.

In re Jorgensen, 66 B.R. 104, 108-09 (9th Cir. BAP 1986) (citations omitted). As stated above, without a resolution of all the conflict issues, no determination of good faith is possible and the Creditors' Committee's plan is unconfirmable as a matter of law. This court must determine that there is at least a chance of making a good faith finding prior to approving the disclosure statement since "a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed." In re Main Street AC, Inc., 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) (citations omitted).

Additionally, there needs to be additional discovery and disclosure before this court can determine that any disclosure statement accompanying the Creditors' Committee's proposed plan has adequate information.

> Section 1125(a)(1) of the Bankruptcy Code requires that a Disclosure Statement provide "adequate information" to claim holders to enable an informed judgment about the proposed plan. "Adequate information" is "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan...." Section 1125 affords the Bankruptcy Court substantial discretion in considering the adequacy of a disclosure statement. . . .

MEMORANDUM DECISION                                                                 8

Case: 11-41900   Doc# 898   Filed: 06/29/06   Entered: 06/30/06 09:49:26   Page 8 of 18

"[A]dequate information" within the meaning of § 1125(a)(1) is not a static concept:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case. . . . There will be a balancing of interests in each case. In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest.

In re Lisanti Foods, Inc., 329 B.R. 491, 507 (D.N.J 2005) (citations omitted). It is appropriate to apply Part VII of the Bankruptcy Rules to the current and any future objections to approval of the disclosure statement and confirmation of any plan proposed by the Creditors' Committee or any other party.

## V. CONCLUSION

The discovery procedures created by the Bankruptcy Rules provide a procedural framework and the necessary safeguards to protect the interests of all parties. As such, the court has issued an order applying Part VII of the Bankruptcy Rules to all plans and disclosure statements in this case. Additional information developed through discovery will hopefully develop sufficient information which will allow the court to determine if the Disclosure Statement and Plan of the Creditors' Committee can proceed.

DATED: Jan 29, 2006

JAMES R. GRUBE
UNITED STATES BANKRUPTCY JUDGE



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
PACIFIC REGIONAL OFFICE
11TH FLOOR
5670 WILSHIRE BOULEVARD
LOS ANGELES, CALIFORNIA 90036-3648

SANDRA W. LAVIGNA
SENIOR BANKRUPTCY COUNSEL
TEL.: (323) 965-3996
FAX: (323) 965-4530

March 24, 2006

Lillian Stenfeldt
Robert S. Gebhard
Sedgewick, Detert, Moran & Arnold L.L.P
One Market Plaza
Steuart Tower, 8th Floor
San Francisco, California 94105

Charles M. Tatelbaum
Adorno & Yoss, P.A.
350 East Las Olas Boulevard
17th Floor
Fort Lauderdale, Florida 33301

Re: **In re 3dfx Interactive, Inc.**
**First Amended Disclosure Statement for**
**Creditors' First Amended Liquidating Plan**

Ms. Stenfeldt, Mr. Gebhard and Mr. Tatelbaum:

The staff has reviewed the First Amended Disclosure Statement for Creditors' First Amended Liquidating Plan filed in this Chapter 11 case. This letter sets out the staff's concerns regarding both substantive and disclosure aspects, in the hope that these issues may be resolved informally.

3dfx Interactive is essentially a corporate shell whose assets consist of cash and causes of action. Its primary asset is the cause of action the Chapter 11 Trustee has asserted against nVidia Corporation, formerly a competitor of 3dfx, a defendant in a patent infringement suit brought by 3dfx and a plaintiff in a later patent infringement suit against 3dfx. The estate's action against nVidia arose from a pre-bankruptcy transaction between 3dfx and nVidia whereby substantially all 3dfx's assets were sold to nVidia. It appears that the estate's action against nVidia is now approaching trial. Certain preliminary rulings have been made, including one that prohibits nVidia from claiming that the assets it received from 3dfx were worth less than $108 million.

Another significant asset of the estate is a set of avoidance actions involving payments from 3dfx to STB, a former subsidiary of 3dfx, or to creditors of STB.

It is the staff's understanding that the Creditors Committee participated in a court-ordered mediation of the nVidia matter, and that after the Trustee rejected the outcome suggested by the mediators, the Creditors Committee and nVidia engaged in mediation without the Chapter 11 Trustee (even though the cause of action belonged to the estate, not the creditors); and the Creditors Committee reached an agreement with nVidia purporting to compromise the estate's cause of action. This compromise would provide benefits to nVidia, to the Creditors Committee itself and to 3dfx's general unsecured creditors. Of course, a Creditors Committee does not have standing to compromise an estate's claim; to circumvent this prohibition, the Creditors Committee has presented the compromise as a liquidating plan, hoping to implement the putative settlement's terms through the plan confirmation process.

## GOOD FAITH ISSUES

A threshold issue would be whether form should prevail over substance in this instance, that is, whether these circumstances may constitute a plan proposal lacking good faith. Although there have been circumstances where courts have confirmed a plan that compromises an estate's cause of action without the debtor's consent, the suggestion of bad faith would be heightened if it is true that (i) two of the seven Creditors Committee members have significant business relationships with nVidia, so that their economic interests are aligned with nVidia's; (ii) a third Committee member is a defendant in an avoidance action brought by the Trustee (the Trustee will be replaced under the compromise by a person the Creditors Committee chooses); and (iii) two additional Committee members are also potential avoidance action defendants, who likewise might benefit from the power to choose the Trustee's replacement. Certainly, it is clear that the Plan gives the Liquidating Trustee broad power over the course of the avoidance actions and the claims objections, with no corresponding duties to maximize benefits to the estate.

It is alleged in the Disclosure Statement (p. 30)[1] that the Committee members whose interests are aligned with nVidia's did not take part in the mediation and that the three members who are actual or possible avoidance action defendants will not be on the Liquidation Subcommittee that will advise the Liquidating Trustee (p. 20) (this would mean that at least one member of the Liquidation Subcommittee would have interests aligned with nVidia's). The staff is not convinced that these non-participation measures remove the taint of the conflicts.

Another troublesome aspect of this compromise as a whole is the control that nVidia has reserved for itself over the compensation of the Committee, its professionals, and in fact all the other professionals employed – and to be employed – in this case. NVidia has provided that it will have the right to object to all Senior Claims. Although the parameters of the class of

---

[1] Page references are to the Disclosure Statement unless otherwise noted.

Ms. Stenfeldt, Mr. Gebhard and Mr. Tatelbaum
March 24, 2006
Page 3

Senior Claims are not entirely clear, it appears that Senior Claims are comprised of the compensation claims of the Chapter 11 Trustee, the Liquidating Trustee and all the professionals employed in the case, except perhaps to the extent that they engage in certain defined activities. NVidia's power over the purse-strings might influence certain decisions the Liquidating Trustee, the Committee and the professionals are in a position to make, to the detriment of fairness. Likewise, nVidia's power to take back any excess funds from the Senior Claims Account, even though that account will be partially funded with cash from the debtor's estate, means that nVidia has extra incentive to exercise its standing under the compromise by objecting to the professionals' fee applications.

These are disturbing issues that appear to undermine the validity of the Settlement. However, separate and apart from the good faith issues, it appears that the settlement may not be "fair and equitable" and that the disclosure has marked deficiencies, including serious bias.

## THE "FAIR AND EQUITABLE" STANDARD

The Creditors Committee asserts that its settlement is in the best interests of creditors (pp. 33-34), but the staff believes that the settlement will have to satisfy the "fair and equitable" standard. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc., v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed. 2d 1 (1968). Moreover, since the seven members of the Creditors Committee arguably are in a position of control (represent perhaps 60% in amount of the general unsecured claims (pp. 15-16) and have asserted their power to speak for all creditors in making the bargain with nVidia), analogous to the shareholder-claimant in *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), the Creditors Committee may well be required to show, not only good faith, but that the compromise is fair to "the entire community of interests in the corporation" including the stockholders. *Id.,* 306.

As set forth below, the present Disclosure Statement does not even begin to present facts that would enable the court to make the requisite determinations regarding the settlement. Further, the disclosure is inadequate in several other respects, including key aspects that impact the Creditors Committee's ability to achieve confirmation of the Plan.

## DISCLOSURE DEFICIENCIES

1.  **Lack of Adequate and Fair Disclosure Regarding the Estate's Suit Against nVidia.** In order to adequately evaluate the bargain that the Creditors Committee has struck with nVidia, the voters and the court will have to compare the terms of that bargain with the likely range of outcomes of the bankruptcy estate's suit against nVidia. There is no discussion of the merits of the estate's claims and the likelihood of the estate prevailing against nVidia; there is not even a statement disclosing that, if the Trustee were to prevail, the creditors would receive a 100% satisfaction and the shareholders would also receive a distribution. Instead,

Ms. Stenfeldt, Mr. Gebhard and Mr. Tatelbaum
March 24, 2006
Page 4

the disclosure (pp. 24-27) outlines the estate's allegations and some aspects of the procedural history, including a reference to nVidia's "vigorous" defense. It is noted that nVidia's expert testified that the assets nVidia purchased were worth no more than $14 million, but there is no corresponding information about the testimony of the estate's expert witness. Similarly, there is a discussion (pp. 25-26) of the estate's motion for partial summary judgment wherein details of nVidia's opposition are disclosed, but very little is said about the estate's arguments. In sum, there is not enough information presented for anyone to form a view as to the likelihood of success for the estate's action against nVidia. What little is presented is not balanced, and no attempt is made to present a risk analysis, or an analysis of the costs of proceeding versus the litigation risk.

It is disclosed that the Chapter 11 Trustee has estimated that fully litigating the matter will incur only $225,000 more in attorneys fees, a figure which is quite small compared to the fees and costs that have already been incurred, but the Disclosure Statement does not make any such observation, instead focusing on its view that pursuit of the estate's action against nVidia will be fraught with appeals, even if the estate prevails. In fact, the Creditors Committee has not failed to mention appeals wherever it has mentioned the action against nVidia (see pp. 25, 27, 33, 48). Although the Creditors Committee may be speaking from knowledge it has gained through its relationships with nVidia, the notion that nVidia will appeal every ruling is somewhat at odds with the fact that currently, it is trying to settle.

One germane comparison that the Disclosure Statement does attempt to make is a comparison between the timing of a distribution under the proposed compromise and a distribution if the estate prevails in its action against nVidia. However, disclosure related to that comparison is deficient, first because of the absence of a risk analysis as discussed above, and secondly because the timing of a distribution under the proposed Plan is not adequately described. Whereas on page 33, the Creditors Committee asserts that a return to the creditors under the Plan will be "prompt," on pages 37 and 49, the Committee reveals that there can be no distribution to creditors until the liquidation is fully administered and all administrative costs are paid, since some of those costs will come out of the $25 million General Claims Account. There is no estimate of the time it will take to fully administer the liquidation. Indeed, if the Liquidating Trustee were to pursue the avoidance actions, and if those defendants were to appeal with the same determination that the Creditors Committee attributes to nVidia, full administration of the estate could take years. There is no mention of this possibility in the disclosure. It is misleading for the Disclosure Statement to broadly state that a distribution would be "prompt" when in fact that is only one end of a range of possibilities.

    2.    <u>**Avoidance Actions Against STB/STB Creditors**</u>. On pages 13-14 and 19-21, the Creditors Committee mentions or discusses the avoidance actions. As noted above, three of the seven Committee members are STB Creditors, and one of these is a defendant in an avoidance action brought by the Chapter 11 Trustee. Also, the Creditors Committee is to be a post-Effective Date advisor to the Liquidating Trustee. Taken in context, the discussion of the

STB avoidance actions seems to be saying that the Liquidating Trustee will not pursue these. (See, for example, the paragraph at lines 8-14 on page 21 and the estimate of post-Effective Date fees at pp. 50-51, footnote 9.) If in fact this is the intention, then the Creditors Committee should disclose this up front. (Is this why the distribution to unsecured creditors is claimed to be "prompt?")

Conversely, if the Creditors Committee does intend to provide a realistic opportunity for pursuit of these actions, it should also provide a meaningful analysis disclosing the projected range of possible recoveries, based on relevant facts and law. Otherwise this aspect of the compromise cannot be evaluated under the "fair and equitable" standard.

3. **Post-Confirmation Management: Identity? Compensation? Duties?** As you no doubt know, 11 U.S.C. § 1129(a)(5) requires disclosure of "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor" and a showing that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy" as well as disclosure of "the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider." This information is supposed to be provided at the disclosure stage, so that voters can factor in that information in reaching a decision.

The Disclosure Statement includes no such information. Instead, the Creditors Committee proposes to announce the person chosen as Liquidating Trustee ten days before the hearing on Plan confirmation, after voting has taken place. Likewise, the Liquidation Subcommittee, analogous to a Board of Directors, will be announced at the same time. There is no disclosure regarding the amount of the Liquidating Trustee's or the Liquidation Subcommittee's compensation. The Creditors Committee gets to remain in office (p. 43), serving as an advisor, and there is no disclosure regarding the amount of its proposed compensation, either. The Disclosure Statement is thus out of compliance with a requirement that affects both the adequacy of disclosure and the availability of confirmation.

One of the Disclosure Statement's most troubling deficiencies is its failure to describe the Liquidating Trustee's duties. The Liquidating Trustee will have enormous discretion and power over the estate's assets and creditors, including sole authority to bring objections to claims and to prosecute, settle or abandon the estate's remaining causes of action. It may be that these parameters will be specified in the Liquidating Trust Agreement, but this Agreement is not to be disclosed until shortly before the confirmation hearing. Given such a time frame, there is no way for the creditors to know exactly what they are voting for. Such disclosure is wholly inadequate.

Ms. Stenfeldt, Mr. Gebhard and Mr. Tatelbaum
March 24, 2006
Page 6

4. **Classification: Discrepancy Between Creditor Classification in Plan and Priorities Established in Settlement Agreement**. The settlement agreement establishes a hierarchy of claims that it names "Senior Claims", "Primary Senior Claims" and "Other Senior Claims." The parameters of these categories are not entirely clear. "Primary Senior Claims" is a residual category comprised of all "Senior Claims" (defined as § 507 claims) that are not "Other Senior Claims." The latter are defined as claims incurred in resolving disputed Unsecured Claims and avoidance actions. The compromise gives nVidia standing to object to Primary Senior Claims, but (apparently) not Other Senior Claims. While Primary Senior Claims (presumably "unclassified claims") have their own fund of money and entitlement to further contributions from nVidia and the General Claims fund, the Other Senior Claims are to be paid only by the General Claims fund.

It is not clear how this aspect of the compromise hierarchy meshes with the Classified Claims. In the discussion of the treatment of Class 3 Unsecured Claims at page 37, it is stated, "All costs, fees and expenses, including, but not limited to any reasonable attorneys' fees that are incurred by the Liquidating Trustee after the Effective Date . . . also will be funded by the Liquidating Trust. Such post-Effective Date fees and expenses shall be paid or withheld prior to the distribution to the Unsecured Creditors, *and they shall have priority over the Class 3 Unsecured Claims.*" [emphasis added] Disclosure of this interplay should be clarified. Should the Liquidating Trustee claims be presented as a separate class, subordinate to Secured Claims but superior to Unsecured Claims?

5. **Third-Party Releases of Liability?** The Plan provides that nVidia and "the Estate Representatives" will discharge and release each other and their officers, directors, predecessors, attorneys, employees, consultants and other agents and representatives" from any and all claims (whether or not culpable behavior is involved) "relating to the Debtor or the nVidia Action." This language is unclear, not indicating whether the intention is to preclude any creditors' and shareholders' claims against nVidia or its officers, directors, etc. If that is the intention, it should be clarified. Generally, such releases are not permissible except to the extent provided in 11 U.S.C. § 1125(e).

6. **Advocacy Versus Fair Disclosure.** Unlike a motion for approval of a compromise, the primary purpose of a disclosure statement is to present fair disclosure regarding the facts and effects of the proposed plan, so that voters are in a position to discern how it would affect their interests. In addition to the lack of balanced disclosure discussed in the paragraphs above, there are other instances where disclosure should be revised to more fairly reflect the circumstances of this case and the proposed plan.

- The paragraph on page 1, lines 22-25 is somewhat misleading. Although this paragraph states, "The nVidia Settlement Agreement is the product of a lengthy, judge-supervised mediation in which the Committee, the Trustee and nVidia, among other parties, participated," it appears from other information elsewhere in the Disclosure Statement (p. 30) that the Committee-nVidia agreement (1) was the product of eight months of negotiations that

**EXHIBIT** **PAGE**
Case: 11-41900    Doc# 898    Filed: 06/29/06    Entered: 06/30/06 09:49:26    Page 15 of 18

Ms. Stenfeldt, Mr. Gebhard and Mr. Tatelbaum
March 24, 2006
Page 7

did *not* include the Trustee, and (2) although the mediators may be sitting judges, the mediation was not a judicial proceeding. To assert otherwise gives the Settlement Agreement a *gravitas* it does not deserve.

- To make the disclosure balanced and to afford a more realistic perspective, information about the Committee's conflicts should be included up front, in the Introduction, not tucked away in the Appointment of Committee section on pages 15-16.

- The paragraph at the bottom of page 30 is biased in saying that the Trustee "took the position" that he had a fiduciary duty to both creditors and interest-holders (when, in fact, that is accepted law) and in focusing on the Trustee's "beliefs" in rejecting the Committee-nVidia Settlement, rather than presenting the actual arguments against acceptance of the Settlement.

- It is misleading for the Creditors Committee to say (p. 34, ll. 13-14): "Because the creditors, not the Committee or the Trustee, will vote on the Plan . . ." unless in fact the Creditors Committee members are pledging to abstain from voting their 60% or more position. While the Committee, as a Committee, obviously does not vote, it would be highly unusual for the Committee members not to vote their claims, especially when, as here, they are in a position to control the process.

\* \* \* \* \*

The foregoing comments are made without prejudice to the Commission staff's right to make other or further comments or objections regarding the Disclosure Statement and Plan. Your response to these comments would be appreciated.

Very truly yours,

*Sandra W. Lavigna* (signature)

SANDRA W. LAVIGNA

cc:  Nanette Dumas
     Robert E. Izmirian
     Frank A. Merola

| | |
|---|---|
| 1 | Case No. 02-55795 JRG |

## UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### CERTIFICATE OF SERVICE

    I, the undersigned, a regularly appointed and qualified Judicial Assistant in the office of the Bankruptcy Judges of the United States Bankruptcy Court for the Northern District of California, San Jose, California hereby certify:

    That I am familiar with the method by which items to be dispatched in official mail from the Clerk's Office of the United States Bankruptcy Court in San Jose, California processed on a daily basis: all such items are placed in a designated bin in the Clerk's office in a sealed envelope bearing the address of the addressee, from which they are collected at least daily, franked, and deposited in the United States Mail, postage pre-paid, by the staff of the Clerk's Office of the Court;

    That, in the performance of my duties, on the date set forth below, I served the **MEMORANDUM DECISION** in the above case on each party listed below on the next page by depositing a copy of that document in a sealed envelope, addressed as set forth, in the designated collection bin for franking, and mailing.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _June 29, 2006_ at San Jose, California.

_Lisa Sucre_
LISA SUCRE

### CONTINUED NEXT PAGE

/////
/////
/////
/////

Case No. 02-55795 JRG

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### <u>CERTIFICATE OF SERVICE - page 2</u>

| | |
|---|---|
| Nanette Dumas, Esq.<br>Office of the U. S. Trustee<br>280 So. First Street, Rm. 268<br>San Jose, CA 95113-3099 | Eric Goldberg, Esq.<br>Frank A. Merola, Esq.<br>K. John Shafer, Esq.<br>STUTMAN TREISTER & GLATT<br>1901 Avenue of The Stars, 12th Floor<br>Los Angeles, CA 90067-6013 |
| Steven D. Roland, Esq.<br>Robert S. Gebhard, Esq.<br>SEDGWICK DETERT MORAN & ARNOLD<br>One Market Plaza<br>Steuart Tower, 8th Floor<br>San Francisco, CA 94105 | Henry H. Oh, Esq.<br>DLP PIPER RUDNICK GRAY CARY LLP<br>550 South Hope Street, Suite 2300<br>Los Angeles, CA 90071-2631 |
| Robert E. Izmirian, Esq.<br>Peter G. Bertrand, Esq.<br>BUCHALTER NEMER FIELDS et al.<br>333 Market St., 25th Floor<br>San Francisco, CA 94105-2126 | Lisa Hill-Fenning, Esq,<br>DEWEY BALLANTINE LLP<br>333 South Grand Ave., 26th Floor<br>Los Angeles, CA 90071 |
| Frederick D. Holden, Jr., Esq.<br>Karen Johnson-McKewan, Esq.<br>James N. Kramer, Esq.<br>ORRICK HERINGTON & SUTCLIFFE LLP<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA 94105-2669 | David Duperrault, Esq.<br>SILICON VALLEY LAW GROUP<br>25 Metro Drive, Suite 600<br>San Jose, CA 95110<br><br>Reem J. Bello, Esq.<br>ALBERT WEILAND & GOLDEN<br>650 Town Center Drive, Suite 950<br>Costa Mesa, CA 92626 |
| Sandra W. Lavigna, Esq.<br>UNITED STATES SECURITIES &<br>EXCHANGE COMMISSION<br>Pacific Regional Office<br>11th Floor<br>5670 Wilshire Boulevard<br>Los Angeles, California 90036-3648 | J. Jeremiah Breen<br>602 South Union Street<br>Lawrence, MA 01843 |